IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 21, 2014 at Knoxville

## JAMES E. HURD v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-13-106      Roy B. Morgan, Jr., Judge**

**No. W2014-00137-CCA-R3-PC  -  Filed November 18, 2014**

The Petitioner, James E. Hurd, appeals as of right from the Madison County Circuit Court's denial of his petition for post-conviction relief. On appeal, the Petitioner contends that his trial counsel was ineffective for failing to obtain certain discovery materials, failing to adequately communicate with him, and failing to interview and call several character witnesses at trial. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Joseph T. Howell, Jackson, Tennessee, for the appellant, James E. Hurd.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; James G. Woodall; District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

Following a jury trial, the Petitioner was convicted of two counts of aggravated sexual battery. The trial court sentenced him to twelve years' imprisonment for each count, with the sentences to run concurrently. This court affirmed the Petitioner's convictions on direct appeal. See State v. James Eric Hurd, No. W2011-01232-CCA-R3-CD, 2012 LEXIS 474

(Tenn. Crim. App. June 28, 2012).[1]

The convictions arose from allegations that the Petitioner fondled his twelve-year-old daughter on two separate occasions. Id. at *2. On direct appeal, this Court gave the following synopsis of the victim's[2] trial testimony:

The victim testified that around the date of her twelfth birthday, on February 8, 2010, she went to visit her father, the [Petitioner], at his house. . . . The victim testified that she was in the living room when her father called her into the bedroom and told her to take off her clothes. . . . Because the victim did not want to remove her clothing, she tried to avoid complying by going to the bathroom. The victim testified that when she came out of the bathroom, the [Petitioner] again told her to take off her clothes; she did not do so. The victim was standing by the bed and the [Petitioner] was on the bed. The [Petitioner] told her to undress again. The victim testified that she then complied and completely undressed. The [Petitioner] then told her to lie down on the bed. He then touched her vagina and breasts, and as he did so, he told her, "Don't let boys touch here." She testified he touched her breasts for three to five minutes. She testified that he also looked closely at her vagina and touched her vaginal area for five minutes. She testified that the [Petitioner] told her that her mother had asked him to "have a sex talk" with her. The victim told two friends about the incident but did not tell any adults.

On a Saturday in April of the same year, the victim accompanied the [Petitioner] to his auto painting business. The victim went with the [Petitioner] to the office, and the [Petitioner] told the victim to get undressed and lie on the table. The victim testified that [Petitioner] kissed her mouth and touched her breasts, buttocks, and vaginal area for "a long time."

Id. at *2-4.

Rachel Williamson, a crisis counselor for the Jackson-Madison County School System, also testified at trial. Ms. Williamson testified that on April 26, 2010, a student at the victim's school told her about allegations the victim made against her father. Id. at *1. Ms. Williamson stated that she interviewed the victim and then contacted the Department of

---

[1]Only the Lexis citation is currently available.

[2]In order to protect the identity of minor victims of sexual abuse, it is the policy of this Court not to refer to them by name.

Children's Services (DCS), the victim's mother, and the police. Id. The victim's mother testified that she first heard about the abuse allegations on April 26, 2010. Id. at *8. She testified that she had asked the Petitioner to talk to the victim about being disrespectful to the victim's stepfather, but that she never asked the Petitioner to speak with the victim about either sex or her menstrual cycle. Id. at*8, *11.

At trial, the State introduced into evidence a statement that the Petitioner gave to police on April 30, 2010. Id. at *5-6. In his statement, the Petitioner admitted having a conversation with the victim about people touching her inappropriately and also talked to her about "coming on her cycle." Id. at *6. He went on to say that he asked the victim to take off her clothing so that he could "check" her to "make sure no one touched her or fondled her." Id. The Petitioner also stated that the victim took off her clothes and that he "checked" her. Id. According to the Petitioner's statement, the victim asked him what fondling was, and the Petitioner responded that it was "touching," and he pointed to the victim's breasts and vagina. Id. In his statement, the Petitioner also claimed that he told the victim that "it was wrong for anyone, Mom, Dad, or anyone to touch her." Id.

Dr. Lisa Piercey, a pediatrician, testified as an expert witness in the field of medicine concerning the maltreatment of children. Dr. Piercey testified that she took the victim's medical history and impressed upon the victim the importance of providing accurate information. Id. at *7. Dr. Piercey testified that the victim's narrative of the events was essentially the same as that provided in the victim's testimony, except that the victim did not tell Dr. Piercey that the Petitioner touched her breasts. Id. Dr. Piercey performed a physical examination of the victim. According to Dr. Piercey, there was no evidence of the alleged abuse, which she stated was not surprising because the type of crime the victim described "very rarely, if ever, leaves any physical evidence" and also because the last instance of abuse occurred two months before the examination. Id.

The Petitioner testified on his own behalf at trial. He testified that the victim's mother had asked him to speak with the victim about being disrespectful to her stepfather and also about sex. Id. at *9. The Petitioner denied asking the victim to take off her clothes on February 8, 2010, and also denied touching her. Id. at *10. According to the Petitioner's testimony, he visited with the victim on April 24, 2010, and, per a request by the victim's mother, asked the victim how she felt about "coming on her cycle." Id. The Petitioner did acknowledge asking the victim to take off her clothes on April 24 but again denied ever touching her. Id. at *11. He testified that he asked her to remove her clothes so that he could "check her" for bruises on her breasts and vaginal area. Id. He stated that he did this because "when he had asked her . . . if anyone had touched her, she paused before saying 'no.'" Id. The Petitioner testified that he believed his examination was appropriate. Id.

Following his direct appeal, the Petitioner filed a pro se petition for post-conviction relief on April 15, 2013. The post-conviction court appointed counsel, and an amended petition was filed on May 20, 2013. The amended petition alleged that Petitioner was denied the right to pursue appellate review by filing a Rule 11 application to the Tennessee Supreme Court. The amended petition also asserted that the Petitioner received ineffective assistance of counsel based on the following: failing to obtain discovery materials and records from the Department of Children's Services; failing to call certain character witnesses; failing to obtain Jencks material for impeachment of the State's witnesses; and failing to challenge the Petitioner's sentence as "excessive" on appeal. On July 15, 2013, the post-conviction court entered an order allowing the Petitioner to file a Rule 11 application for permission to appeal to the Tennessee Supreme Court. The Petitioner's Rule 11 application was denied on November 18, 2013, and the post-conviction court proceeded with an evidentiary hearing on January 6, 2014.[3]

At the post-conviction hearing, the Petitioner testified that trial counsel failed to properly conduct discovery and never requested any medical records. He stated that "[i]t would have been a whole different ball game if we had the medical records." The Petitioner also testified that trial counsel should have obtained records of the victim's interview from DCS and the Carl Perkins Center to verify that his version of events was true.

The Petitioner next testified that trial counsel failed to interview anyone other than the Petitioner and his wife. When asked whether he requested that trial counsel interview other witnesses, the Petitioner responded that "[a]ccording to the disciplinary rule, it's his job to do it automatically" and further stated that he provided trial counsel with the following names: Shontelle Hurd Simmons, Cheryl King, Charles Daniel, Wade Powell, Pamela Randle, and Diane Peeples. According to the Petitioner, if trial counsel had interviewed these people "he would have found out that [the Petitioner] wasn't a sexually defile [sic] person" but rather that he was a "concerned, . . . little overprotective father."

The Petitioner also testified that there was a lack of communication between himself and trial counsel. He stated that when he went to trial counsel's office, they barely talked and that trial counsel seemed "busy. . . like he had a case overload or something." According to the Petitioner, he could have been found innocent had he been able to adequately communicate with trial counsel. The Petitioner explained that he wanted trial counsel to understand "the real story," which was that he was a concerned father who thought the

---

[3]In both the original pro se petition and the amended petition, the Petitioner raised numerous issues. However, at the post-conviction hearing and in this appeal, the Petitioner argues only that he received ineffective assistance of counsel due to counsel's failure to obtain discovery, failure to call character witnesses, and failure to adequately communicate with the Petitioner.

victim's stepfather might be abusing the victim.

On cross-examination, the Petitioner admitted that the medical records actually would not have proven anything because he testified that he never touched the victim, and the trial expert testified that the type of abuse alleged rarely left physical evidence. The Petitioner also admitted that in 1986 he had been convicted of kidnaping, sexual battery, and theft of a vehicle. The Petitioner stated that he was not worried about his prior convictions being introduced at trial because he "[had] no shame." When cross-examined about his communication with trial counsel, the Petitioner testified that he did meet with trial counsel three to four times but that during these meetings, trial counsel "came in, spoke, went out, and did other things." The Petitioner also testified that he wanted trial counsel to talk to the victim.

The Petitioner then presented six witnesses that he wanted trial counsel to offer as character witnesses at trial. Each witness essentially testified that the Petitioner was a good father and stated that he or she would have been willing to testify on the Petitioner's behalf at trial. Despite favorable testimony from each witness that the Petitioner was a good father, several witnesses expressed reservations when questioned about the Petitioner's admission that he had examined his daughter's breasts and vaginal area and felt that the situation should have been handled differently.

Ms. Simmons, who was married to the Petitioner at the time the abuse occurred and during the trial, testified that the Petitioner had a "very loving, very close relationship" with the victim. On cross-examination, Ms. Simmons testified that she felt the Petitioner had the right to check the victim because she was his daughter. Ms. Simmons testified that she was with the Petitioner when he met with trial counsel. According to Ms. Simmons, trial counsel met with them during the week and occasionally on Saturday if that was more convenient. She recollected that they met with trial counsel a total of five to six times, and she agreed that during those meetings she did not perceive any difficulty in communication between trial counsel and the Petitioner. She testified that trial counsel and the Petitioner "talked about all the facts, good and bad" and that she felt well-prepared for everything that was going to occur at trial. She admitted that any reservations she had about trial counsel were more to do with the stress of the situation rather than any inadequacy of trial counsel and that neither she nor the Petitioner ever expressed concerns to trial counsel regarding his preparedness for trial.

On re-direct examination, Ms. Simmons testified that she "just felt like there could have been more done," and when asked to state specifically what more should have been done, she responded that it felt like trial counsel never had a plan. Ms. Simmons stated her belief that not "enough information had been related or pulled out for the benefit of [the

Petitioner],” and that none of “it” had been thoroughly investigated. When asked to be more specific, she testified that someone should have talked to the victim.

Trial counsel testified that he had practiced law for twenty years and that about eighty percent of his practice was criminal. With respect to the medical records, trial counsel testified that Dr. Piercey’s records were part of the discovery he received from the State and that Dr. Piercey testified and was cross-examined at trial. Trial counsel testified that he received transcripts of the victim’s interview at the Carl Perkins Center, and that he was thus unaware of any additional material that he could or should have obtained. Trial counsel further testified that he spoke with the victim coordinator at the prosecutor’s office and was informed that the victim did not want to meet with him. When asked about the frequency of his meetings with the Petitioner, trial counsel responded that he “met with [the Petitioner and his wife] whenever they wanted to meet.” According to trial counsel, the Petitioner and his wife were easy to get along with, and although it was a “difficult case,” the Petitioner “seemed to be a nice enough guy.”

Trial counsel admitted that although the Petitioner wanted him to re-investigate his 1986 convictions, he never looked into them because he did not think they were relevant to the current case. Trial counsel then explained that his decision not to call any character witnesses was based on his fear that the prosecution would impeach the witnesses’ testimony with the Petitioner’s prior convictions, which “couldn’t have done anything but harm [the Petitioner].” Trial counsel testified that he discussed the decision not to call character witnesses with the Petitioner. Furthermore, trial counsel testified that he and the Petitioner discussed the charges against him as well as potential defenses. He stated that the Petitioner understood the charges and wanted to testify on his own behalf.

On cross-examination, trial counsel stated that he felt the reason the Petitioner wanted him to re-investigate the prior convictions was so that trial counsel would “think better of [the Petitioner].” However, trial counsel testified that he never doubted that the Petitioner had been “over-convicted” in the 1986 case. Instead, he testified that he simply did not think he could do anything about the prior convictions and believed that they were irrelevant to the case at hand. Trial counsel testified that he could not remember physically handing the Petitioner his case file, but that it was the policy of his office to provide files to clients. He also stated that if the Petitioner did not actually receive his file, “all he had to do was ask.” According to trial counsel, he and the Petitioner spoke about potential defense theories. For example, trial counsel testified that they discussed that the victim might be “moving a little rapidly in her sexual encounters” or might be “over-exaggerating for attention.” Trial counsel further testified that there were more witnesses present at the post-conviction hearing than he was made aware of at trial, and he reiterated his belief that calling character witnesses would have ultimately been damaging to the Petitioner’s case.

-6-

On February 1, 2014, the post-conviction court entered an order denying the petition for post-conviction relief. The post-conviction court found that the Petitioner had access to medical records prior to trial and that Dr. Piercey testified regarding the findings from her medical examination of the victim. Additionally, the post-conviction court found that the Petitioner failed to present evidence of any discovery material that was not made available to him or that trial counsel did not have access to. The post-conviction court found that trial counsel adequately communicated with the Petitioner and also that trial counsel attempted to interview the victim prior to trial but that she declined to meet with him. Finally, the post-conviction court concluded that trial counsel was not ineffective for failing to present certain character witnesses at trial and further stated that the Petitioner had failed to present any witnesses whose testimony would have affected the outcome of the trial.

ANALYSIS

The Petitioner contends that the post-conviction court erred in denying his petition for post-conviction relief. The Petitioner asserts that he received ineffective assistance of counsel because trial counsel failed to obtain important discovery materials, failed to present character witnesses at trial, and failed to effectively communicate with the Petitioner. The State responds that the Petitioner failed to prove that trial counsel did not properly conduct discovery and that the Petitioner himself admitted that the medical records were not really helpful to his case. The State further responds that trial counsel testified that he was able to adequately communicate with the Petitioner, and the Petitioner's now ex-wife corroborated that testimony. Finally, the State responds that trial counsel made a reasonable strategic decision not to call character witnesses based on his concern that it would lead to the admission of damaging evidence against Petitioner.

In a post-conviction proceeding, the burden is on the Petitioner to prove his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that

counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.

The Petitioner first asserts that trial counsel was ineffective because he failed to properly conduct discovery. Specifically, the Petitioner argues that trial counsel should have looked at the victim's medical records. However, the Petitioner has failed to prove that there are any medical records that trial counsel failed to obtain. In fact, the evidence shows that trial counsel did receive records of the examination Dr. Piercey performed. Also, Dr. Piercey testified and was cross-examined at trial. The Petitioner also asserts that trial counsel should have obtained records from the Carl Perkins Center, but the record reflects that the State provided trial counsel with a transcript of the victim's interview at Carl Perkins. Furthermore, trial counsel testified that although he did attempt to interview the victim, the victim coordinator at the prosecutor's office informed trial counsel that the victim did not wish to speak to him. Accordingly, we hold that the Petitioner has failed to prove that trial counsel's performance in this respect was ineffective.

The Petitioner next contends that trial counsel was ineffective because he failed to call seven character witnesses at trial. "When a petitioner presents at the post-conviction hearing a witness he claims should have been called at trial, the post-conviction court must determine whether the testimony would have been (1) admissible at trial and (2) material to the defense." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008). The post-conviction court

may find that trial counsel's performance was not deficient by concluding either that the proffered testimony would not have been admissible at trial or that "it would not have materially aided the petitioner's defense at trial." Id.

The Petitioner contends that evidence of his good character would have resulted in his acquittal, and thus claims that trial counsel's failure to call character witnesses was prejudicial. All of the witnesses testified that the Petitioner was a good father, but several stated that they considered Petitioner's physical examination of his daughter inappropriate. Trial counsel testified that he was extremely concerned that presenting character witnesses would lead to the State's use of the Petitioner's prior convictions to rebut the character evidence. According to trial counsel, he discussed with the Petitioner the pros and cons of presenting character witnesses at trial. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Felts v. State, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting Strickland, 466 U.S. at 689). Furthermore, this court has previously affirmed the validity of trial counsel's strategic decision not to call character witnesses for fear that it will lead to the introduction of damaging rebuttal evidence. See Chet Allen Walker v. State, No. E2006-01188-CCA-R3-PC, 2007 WL 763217 at *6 (Tenn. Crim. App. Mar. 14, 2007) (pointing out that Tennessee Rule of Evidence 404(a)(1) allows evidence of a character trait to be offered by the prosecution to rebut a defendant's evidence of good character in a criminal case). The record reflects that trial counsel made a strategic decision not to present character witnesses after consideration of the consequences and after discussion with the Petitioner. The Petitioner's claim is therefore without merit.

Finally, the Petitioner contends that trial counsel's performance was ineffective because trial counsel failed to adequately communicate with the Petitioner. At the post-conviction hearing, the Petitioner testified that he met with trial counsel three to four times but that trial counsel seemed preoccupied and did not really discuss the case with him. However, the Petitioner's ex-wife testified that trial counsel met with the Petitioner five to six times and that she was present at these meetings. She stated that she perceived no difficulties in communication between the Petitioner and trial counsel and that neither she nor the Petitioner ever expressed concerns about trial counsel's performance. Trial counsel testified that he met with the Petitioner whenever requested and that they discussed the charges against the Petitioner, the pros and cons of calling character witnesses, and potential defense strategies. The Petitioner's assertion that he was unable to effectively communicate with trial counsel is unsupported by the record.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the

-9-

post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE